IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION


**RANDALL BRIAN BUSH**,

              Plaintiff,

    v.

**MICHAEL J. ASTRUE**, Commissioner
of Social Security,

      Defendant.

Case No. CV10-780-SU

**FINDINGS AND
RECOMMENDATION**


Sharon Maynard
Bennett, Hartman, Morris & Kaplan
210 S.W. Morrison Street, Suite 500
Portland, Oregon 97204
      Attorney for plaintiff

Dwight C. Holton
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
Willy M. Le
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900
Seattle, Washington 98104
      Attorneys for defendant


Findings and Recommendation Page 1

SULLIVAN, Magistrate Judge:

Randall Bush brings this action pursuant to Section 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner

of the Social Security Administration ("Commissioner") denying his application for Disability

Insurance benefits ("DIB") under Title II of the Social Security Act.

## PROCEDURAL BACKGROUND

Mr. Bush filed an application for DIB on August 17, 2005, on the basis of Hodgkins

lymphoma, in remission; steroid-induced diabetes mellitus; depression; and somatoform

disorder.  His alleged onset date is January 28, 2005, the last day he engaged in substantial

gainful activity.  His claim was denied initially and upon reconsideration.  Mr. Bush requested a

hearing, which was held before administrative law judge ("ALJ") Riley J. Atkins on March 17,

2008.  The ALJ issued a decision on August 14, 2008, finding Mr. Bush not disabled.  When the

Appeals Council denied a request for review, the ALJ's decision became the final decision of the

Commissioner.

Mr. Bush was born in 1957, and was 51 years old at the time of the ALJ's decision.  He

has a college education.  His past relevant work is as a library clerk.  His date last insured is

December 31, 2009.  A DIB claimant must establish that the current disability began on or before

the date last insured.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

## THE SEQUENTIAL EVALUATION

The Commissioner has established a five-step sequential process for determining whether

a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920.  At step one, the Commissioner determines whether the claimant has engaged in any

substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner

goes to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c).  That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which
> significantly limits your physical or mental ability to do basic work activities, we
> will find that you do not have a severe impairment and are, therefore, not disabled.
> We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).  If the impairment is severe, the evaluation proceeds to the third

step, where the Commissioner determines whether the impairment meets or equals "one of a

number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." Yuckert, 482 U.S. at 140-41.  If a claimant's impairment meets or

equals one of the listed impairments, he is considered disabled without consideration of his age,

education or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment,

the Commissioner considers, at step four, whether the claimant can still perform "past relevant

work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant shows an inability to perform his

past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the

residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience.  Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),

416.920(f).

## MEDICAL EVIDENCE

Mr. Bush was diagnosed with Stage 4B Hodgkins lymphoma in 1997.  Tr. 551.  He

completed chemotherapy in September 1998. *Id.* In 2001, the cancer returned, and on August 31, 2001, he received an autologous stem cell transplant. *Id.*; tr. 539. On October 2, 2001, Mr. Bush was diagnosed with acute hepatitis, secondary to veno-occlusive disease. Tr. 529. In December 2001, Mr. Bush was diagnosed with steroid-induced diabetes mellitus. Tr. 466.

Mr. Bush began complaining of nausea in August 2001, and these complaints have continued. In December 2001, he underwent upper gastrointestinal endoscopy and colonoscopy, with normal results. Marinol[1] relieved some of his symptoms, and acupuncture begun in February 2002 gave "marked improvement," reducing the frequency of vomiting to one out of five meals. Tr. 453, 456, 462, 473. On March 8, 2002, Mr. Bush saw Herbert Salomon, M.D., a gastroenterologist. Tr. 453. Mr. Bush told Dr. Salomon he was currently on Prednisone every other day, and that he had been taking the antidepressant Zoloft (sertraline) for many years. *Id.* Dr. Salomon wrote that the etiology of Mr. Bush's nausea and vomiting was "unclear," possibly the result of prior chemotherapy; secondary to diabetes, medication, or irritation of the central nervous system from medication or tumor; or stress-induced. Dr. Salomon wrote that "[s]ince he is getting relief from the acupuncture, I have not introduced any further medication for his symptoms." Tr. 454.

On June 4, 2002, Mr. Bush reported that he had been feeling well, walking 2.5 miles in 45 minutes, but that he had been "miserable" for the last few days, with weakness, nausea and vomiting. He felt too weak to return to work. Tr. 438. On July 3, 2002, Mr. Bush reported to

---

[1] Marinol (dronabinol) is a pharmaceutical product available through prescription whose active ingredient is synthetic tetrahydrocannabinol ("THC"), which has been found to relieve the nausea and vomiting associated with chemotherapy for cancer patients. United States Drug Enforcement Administration, *"Medical" Marijuana - The Facts*, available at http:www.justice.gov/dea/ongoing/marinol.html.

Findings and Recommendation Page 4

Stephen Chandler, M.D. that he had not been feeling well for the past two months, although he was getting "dramatically better prior to that." Tr. 432. He said he was nauseated in the morning, but had not vomited for months, and that the nausea was not "wipeout" nausea, meaning that he could still function. *Id.* An MRI of the head and a Gastric Emptying Procedure yielded normal results. In February 2002, Mr. Bush reported that he was working out for an hour four days a week, but had difficulty staying awake. On February 20, 2003, he was diagnosed with sleep apnea. Tr. 415.

On May 30, 2003, Mr. Bush saw Marcia Dunham, M.D., for complaints of continuing nausea. Tr. 391. Dr. Dunham noted that Mr. Bush said the only thing that had ever worked well for the nausea was Marinol. Tr. 392. Dr. Dunham wrote that "eval[uation] for cause of nausea hasn't been helpful," although he "got better when he stopped the glucophage."[2] *Id.* Dr. Dunham prescribed the anti-nausea drug Torecan (thiethylperazine). *Id.* By July 15, 2003, Mr. Bush was taking Marinol again, and reported "minimal nausea." Tr. 387. He was back to working full-time and exercising. *Id.*

On October 28, 2003, Mr. Bush was diagnosed with shingles. Tr. 384. On November 7, 2003, Dr. Chandler noted that Mr. Bush was working full-time, but complaining of nausea in the morning. Tr. 380. Dr. Chandler wrote, "Marijuana helps most." *Id.*

On January 20, 2004, Mr. Bush was given a psychiatric evaluation by Judy Perry, M.D. Tr. 365-67. Mr. Bush said he had been depressed nearly all of his adult life. Tr. 365-66.

---

[2] According to the National Center for Biotechnology Information ("NCBI"), a division of the National Library of Medicine ("NLM") at the National Institutes of Health "NIH"), glucophage (trade name Metformin) is used to treat diabetes by helping to control the amount of glucose in the blood. Available at www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974.

However, during the past year he had been experiencing euphoric episodes lasting four to five

hours, occurring as frequently as a couple of times a month.  Tr. 366.  The episodes ended with a

"fast drop into depression."  *Id.*  He had been on psychotropic medications for most of the

previous 20 years, and reported a distinct benefit from them, without particular side effects.  *Id.*

On mental status examination, he was alert and cooperative.  Tr. 367.  His cognition

showed a clear sensorium and he denied any hallucinations, delusions, or thought disorders.  *Id.*

His thought processes were easy to understand and follow.  *Id.*  Thought content focused on

pervasive, consistent depressive experiences, with the development more recently of mood

swings.  *Id.*  He denied any panic, obsessive-compulsive symptoms, or phobias.  *Id.*  Speech was

clear with a normal rate and flow.  *Id.*  He was highly articulate and obviously well read, with

above average vocabulary and comprehension.  *Id.*  His mood was depressed.  *Id.*  Mr. Bush

related that his headaches and general aches and pains were more intense when he was depressed.

*Id.*

Dr.  Perry diagnosed major recurrent moderate depression and possible variation of a

bipolar or mood disorder, but with none identified.  *Id.*   Dr. Perry saw Mr. Bush on February 18,

2004, noting that he complained of considerable nausea and occasional vomiting, for which

Marinol provided considerable relief.  Tr. 320.  He reported some benefit in his depression with

Remeron (mirtazapine) and the continuation of Zoloft.  Within the last week, he felt his energy

had improved and his outlook had become more positive.  *Id.*

On March 31, 2004, Dr. Perry wrote that the Remeron had not helped Mr. Bush's

depression and that he had discontinued it.  Tr. 319.  Zoloft did not resolve his depressive

///

Findings and Recommendation Page 6

symptoms.  Nausea was persistent.  Dr. Perry continued the Zoloft and started him on another

antidepressant, Wellbutrin (bupropion).  *Id.*

On January 26, 2005, Mr. Bush reported that Marinol was not helping his nausea.  Tr.

311.  He was started on low dose Decadron (dexamethasone), a corticosteroid.  Tr. 311.

However, on February 11, 2005, Mr. Bush reported that the Decadron had provided no relief, and

that Marinol "does not completely get rid of the nausea but it brings it down to a tolerable level."

Tr. 310.

On March 14, 2005, Dr. Perry wrote that Mr. Bush continued to have nausea, "unrelieved

by any known medical approach in Oncology, as well as a variety of naturopathic options."  Tr.

318.  Mr. Bush reported that he had found Tai Chi to be the most helpful remedy to date, and that

he had increased his level of physical activity to at least 40 minutes a day, which had not resolved

the nausea but had made it "somewhat more manageable."  *Id.*  Mr. Bush reported having lost 40

pounds and having very little appetite.  *Id.*  Mr. Bush said his mood was more stable with

medication, and that he had found Zoloft and Wellbutrin to be the best combination to date.

However, he had been disappointed at his employer's turning him down for flexibility in work

arrangements.  *Id.*  Dr. Perry noted that during the interview, Mr. Bush was "visibly shaking and

his arms and body shake to the point that it is difficult for him to continue holding a cup of

water."  *Id.*  He was continued on the Zoloft and Wellbutrin.

On April 12, 2005, Wayne Wong, M.D., a gastroenterologist, noted that a CT scan of the

abdomen, pelvis and chest in February 2005 were negative.  Tr. 318.  Dr. Wong thought it

"highly unlikely" that graft versus host disease was the cause of the nausea.  *Id.*  An upper

endoscopy that day was unremarkable.  Tr. 308.  On June 1, 2005, Dr. Wong noted that all of Mr.

Bush's gastrointestinal diagnostic tests had been negative.  *Id.*  Dr. Wong suggested a trial of

Zelnorm.[3]  *Id.*

On August 19, 2005, Phoebe Trubowitz, M.D. wrote that she had spoken with Mr. Bush's

attorney about his persistent nausea and vomiting, and that she believed it was a "disabling

condition for him," likely secondary to the stem cell transplant.  Tr. 308.  On September 2, 2005,

Dr. Dunham noted that she agreed with Dr. Trubowitz.  Tr. 307.

On September 20, 2005, Mr. Bush told Dr. Petty he was "immobilized" by depression.

Tr. 344.  Dr. Perry wrote that Mr. Bush had had the antidepressants Elavil (amitriptyline) and

Tofranil (imipramine) in the past, but that the Tofranil caused him to become "very wired," so

that he could not sleep.  *Id.*  However, his current medications had  "totally resolved" the mood

swings.  *Id.*  He said he had found Zoloft very effective for depression until recently, although the

Wellbutrin was working well for him.  *Id.*  Dr. Perry noted that Mr. Bush "minimizes his focus

on nausea," saying that he had learned to adapt to it and found little point to talking about it.  *Id.*

Dr. Perry continued him on Zoloft and Wellbutrin and started him on a third antidepressant,

Cymbalta (duloxetine). *Id.*

On October 4, 2005, Mr. Bush reported that the Cymbalta had provided no benefit.  Tr.

343.  He said he had discontinued the THC, but felt worse as a result.  *Id.*  On November 1, 2005,

Mr. Bush missed an appointment with Dr. Perry because he was too nauseated to come in.  Tr.

343.  He said he wanted to reduce and eventually discontinue the Marinol.  Tr. 342-43.

///

---

[3] Zelnorm (tegaserod) is prescribed for gastrointestinal complaints.  *See* NCBI, available
at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH00000251.

Findings and Recommendation Page 8

On November 25, 2005, Peter LeBray, Ph.D reviewed Mr. Bush's records on behalf of the Commissioner.  Dr. LeBray concluded that Mr. Bush's depression produced only mild limitations on his activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, tr. 359.

On March 6, 2006, Mr. Bush told Dr. Dunham he thought the nausea was worse.  He was using a pedometer and trying to do 10,000 steps a day.  Tr. 341.  He attributed a recent weight gain to the use of Marinol, which caused him to "eat[] stuff he knows he shouldn't."  *Id.*  Mr. Bush continued to complain of nausea and vomiting to Dr. Dunham on March 17, May 31, and June 29, 2006.  Tr. 726, 722, 719.  On September 29, 2006, Mr. Bush reported that his nausea was responding better to THC than to the Marinol.  Tr. 687, 706.  On April 12, 2007, Mr. Bush Mr. Bush reported severe nausea, saying he had increased his THC to two or three joints a day.  Tr. 681.  He still took Marinol occasionally but said it made him "goofy."  *Id.*  He was training for the Race for the Cure with his wife, walking 15-25 miles a week.  *Id.*

Mr. Bush told Dr. Perry on September 13, 2007, that he was having episodes of depression lasting up to two weeks.  Tr. 671.  On November 29, 2007, Mr. Bush said his nausea and vomiting were relieved only with THC, which he was "vaporizing," not smoking.  Tr. 664.  On December 3, 2007, Mr. Bush told Dr. Perry his vomiting had decreased and that he was sleeping well.  Tr. 660-61.

On April 25, 2008, Mr. Bush was given a neuropsychological examination by James Bryan, Ph.D.  Tr. 752-63.  The examination consisted of the clinical interview and testing with the Wechsler Adult Intelligence Scale-III ("WAIS-III"); Wechsler Memory Scale-III ("WMS III"); Trailmaking Test Parts A and B; Reitan-Indiana Aphasia Screening Test ("AST"); and

Minnesota Multiphasic Personality Inventory-2 ("MMPI-2").  Dr. Bryan also reviewed Mr.

Bush's medical records.  Tr. 752.

Mr. Bush stated that he had chronic nausea and vomiting, fatigue, and brain damage as a

result of the stem cell replacement and chemotherapy.  Tr. 753.  He described a feeling "like

cotton in my frontal lobes," as well as a "terrible short-term memory," saying that "it takes me

three times longer to watch a movie.  If there's any complicated talking, I don't follow it."  Tr.

753.  Mr. Bush said he had not worked since January 2005.  He had previously cut back his work

areas because of fatigue and difficulty with cognitive efficiency.  *Id.*

Mr. Bush said he received a disability stipend and was supported by his wife's

employment.  His wife did all the financial management because Mr. Bush made mistakes when

paying bills.  *Id.*  Mr. Bush said he normally did not do any activities until 2:00 or 3:00 in the

afternoon because he was sick in the morning.  Tr. 754.  He said he took numerous rest breaks

and stayed home at least three days a week.  However, depending on his stamina, he did most of

the basic housekeeping and light meal preparation.  *Id.*  He said he had difficulty falling and

staying asleep, which he attributed partly to the use of a CPAP machine for sleep apnea.  *Id.*  His

appetite was generally diminished, but medical marijuana improved his appetite somewhat.  *Id.*

Mr. Bush reported that although he had been depressed most of his life, his mood within

recent weeks was "great," and he had a better outlook on life and values since having survived

cancer.  He did not endorse recurrent worries or anxiety, irritability or anger, loss of self-esteem,

or suicidal ideation.  *Id.* Mr. Bush said he had not found antidepressants helpful, and had asked

that they be discontinued.  Tr. 756.

///

Findings and Recommendation Page 10

Upon observation, Mr. Bush displayed no pain behavior, although he commented several times that he felt nauseated. There was "one episode of pronounced retching in the restroom, which was loud and audible through other offices," but "he returned immediately afterward with no apparent distress or change in manner." Tr. 757. His speech was rapid and "mildly too loud." *Id.* He was over-talkative, and elaborated spontaneously and at length, mainly upon his symptoms. *Id.* His social manner was "open, lively and cordial," and he "readily established working rapport and demonstrated strong conversational skills." *Id.* His mood was "upbeat, cheerful, and lively with no indications of distress." *Id.* Dr. Bryan noted that he made several comments "about how good he felt that day, which was a contrast and relief for him from his typical discomfort." *Id.* His affect was "lively, expansive, and wide-ranging," but his thought processes were not consistently well-organized. Tr. 758. He often failed to complete thoughts. He would rapidly digress upon his symptoms, "to a point requiring interruption and re-direction." and Dr. Bryan concluded that his "overall appearance was consistent with a potential hypomanic episode." *Id.*

Mr. Bush's Full Scale IQ was 121, the superior intellectual range. Mr. Bush's attention, concentration and psychomotor speed tested within the average range. Verbal comprehension was superior, and visual spatial constructional functioning scores were within the high average range. Tr. 759. He received scores within the average range on tests of immediate and delayed memory. Tr. 760. Psychopathology testing indicated, in Dr. Bryan's opinion, "a psychologically defensive psychosomatic pattern, in which the individual may repress emotional distress. They instead emphasize physical symptoms and health complaints as a maladaptive means of coping." Tr. 761. In addition, Dr. Bryan thought Mr. Bush had depression, "with subscale elevations

regarding low mood and associated cognitive disturbance and feelings of physical illness," a

form of "agitated depression." *Id.*

In Dr. Bryan's opinion, Mr. Bush demonstrated a "complex clinical condition which

involves several interacting factors," including:

> Emphasis upon physical and health symptoms. According to him, these involve chronic headache, fatigue, pain, clumsiness, digestive distress, and nausea, some of which predate the Hodgkin's diagnosis and treatment.

> There was frequent, spontaneous emphasis and elaboration upon these symptoms. There was an abrupt episode of loud retching which did not appear to show the usual concomitant physical discomfort. This is in the context of a strongly somatoform-related MMPI-2 profile . . .

> Superior range intellectual abilities and strong cognitive functioning. These abilities are inconsistent with his complaints of memory and attentional difficulties.

> His memory scores are within the Average range, which is mildly lower than his other cognitive strengths, and may be noticeable to him. They reflect inefficiencies but not actual impairment.

> Diagnostically, his condition meets criteria for Somatization Disorder, which involves a psychosomatic basis for his complaints and coping difficulties. This diagnosis is listed with consideration for his actual significant medical history.

> The presence of Somatization does not discount the presence and symptoms of Hodgkin's lymphoma. However, the development of somatization has been unclear and may have been a pre-existing tendency, which has been aggravated by the stresses and threats associated with cancer.

> As noted above Somatization disorder, in part, serves a psychological defensive process. There was no indication of deliberate falsification or malingering of symptoms.

> The presence of cyclothymia is listed, to account for hypomanic-like symptoms, which may alternate with depression. This is a mild form of bipolar disorder, however, which during wider mood swings may aggravate his distress and exacerbate the somatization process. This appears to be a chronic pattern, despite ongoing psychiatric treatment.

Tr. 762.  In Dr. Bryan's opinion, Mr. Bush had a "marked" impairment in his ability to respond appropriately to usual work situations and to changes in a routine work setting.  Tr. 765.[4]

Dr. Bryan diagnosed Somatization Disorder, with a provisional diagnosis of cyclothymic disorder.  Tr. 762.

### HEARING TESTIMONY

Mr. Bush testified that the symptoms interfering with his ability to work were mostly nausea, vomiting, confusion and inability to focus.  Tr. 799.  Mr. Bush explained that the nausea started with the chemotherapy he received before the stem cell transplant, in September 2001.  *Id.* He was able to work for about two and a half years afterward, between August 2002 and January 2005.  Tr. 801.  However, the Marinol he was taking for nausea and vomiting made him confused and unable to focus.  Tr. 802.  He stated that the nausea increased to the point of being "overwhelming" by 2004.  *Id.*  He switched from Marinol to smoking marijuana in about 2006. Tr. 812.  When he was not using marijuana in some form, he vomited two or three times a day. Tr. 805.  When using it, he was able to go a week without vomiting, although the nausea did not go completely away.  Tr. 808.

Mr. Bush's wife, Rebecca Bush, testified that her husband had had nausea and "the inability to think clearly" since the stem cell transplant.  Tr. 809.  She said without marijuana, he was "more prone to vomiting," and "pretty much does nothing."  Tr. 813.  Ms. Bush testified that her husband had been allowed to work flexible hours and make up missed time, but that he

///

---

[4] The Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which Dr. Bryan made this assessment, defines "marked" as "a serious limitation," with a "substantial loss in the ability to effectively function."  Tr. 764.

regularly came in late and left early.  Tr. 818.  Ms. Bush said Mr. Bush had struggled with

depression even before he got cancer.  Tr. 820.

## ALJ'S DECISION

The ALJ found that Mr. Bush's history of Hodgkin's lymphoma, in remission, was a

severe impairment, but that his other alleged impairments of steroid-induced diabetes mellitus,

depression and somatoform disorder were non-severe.  The ALJ found the diabetes non-severe

because it was controlled by diet.  Tr. 17.  The ALJ found the depression non-severe because

despite Mr. Bush's statements to Doctors Dunham and Bryan that he had been depressed nearly

all his life, he had successfully worked full time until 2005, including working for "at least a

year" after seeing Dr. Dunham for depression.  Tr. 16, 17.

The ALJ found that Mr. Bush's complaints of nausea and vomiting also preceded his

alleged onset date, while he was still working full time.  The ALJ also noted the absence of

medical etiology for those complaints and Mr. Bush's statements to doctors that he was getting

relief from acupuncture and Marinol.  Tr. 16.  Moreover, Mr. Bush had told Dr. Dunham in April

2007 that his use of THC to control nausea "help[ed] a great deal," and that he was in the midst

of "training for the Race for the Cure, walking 15-25 miles a week."  Tr. 17.  The ALJ cited to

other evidence indicating steady weight gain, and a contradiction beween Mr. Bush's report that

he was nauseated 100% of the time and his statements that he was doing artwork and physical

exercise, as well as helping cleaning the house and making dinner every evening.  *Id.*  The ALJ

noted that Dr. Bryan observed that Mr. Bush's mood was upbeat, cheerful and lively with no

indication of distress, and that Mr. Bush said he did most of the basic housekeeping and light

meal preparation.  Tr. 18.

Findings and Recommendation Page 14

The ALJ found that Mr. Bush had the residual functional capacity ("RFC") to perform the full range of light work, although he rejected the findings of reviewing psychologist LeBray because they were made without the benefit of the updated records of Doctors Perry, Dunham and Bryan. *Id.* The ALJ found no evidence of a link between his Hodgkin's lymphoma and the nausea and vomiting. Tr. 19. Moreover, the ALJ found that Mr. Bush had not experienced the "significant weight loss that would otherwise result from chronic nausea and vomiting." *Id.* The ALJ relied on evidence in the record that through November 2007, Mr. Bush was walking five to six miles a day, with his weight stable at 233 pounds. *Id.*

The ALJ cited to Dr. Bryan's opinion that apart from a marked limitation in Mr. Bush's capacity to respond appropriately to work situations and changes in a routine setting, he had no limitations on his mental capacity to perform basic work activities. Tr. 20. However, the ALJ then stated that he had rejected Dr. Bryan's opinion that Mr. Bush had a marked limitation because

> [i]t appears that Dr. Bryan may have combined the claimant's complaint that stress adds to his nausea and vomiting. That alignment is not consistent with the claimant alleging continuing nausea and vomiting despite not having worked since early 2005. Additionally, an assessment of physical conditions is beyond the scope of Dr. Bryan's expertise. Accordingly, I give the [Mental Residual Functional Capacity] assessment by Dr. Bryan little weight. Also contrary to Dr. Bryan's MRFC assessment, the claimant acknowledges that he remains independent in functioning, with significant activities of daily living. . . . Plus, he has done painting of art works, and on multiple occasions, been observed with an upbeat mood incongruent with his alleged complaints of depressed mood. Further, through September 2007, the claimant did not seek mental health care for almost two years, as noted by Dr. Perry. In turn, Dr. Perry has consistently noted clear and direct thought processes; no suicidal ideation; and that he has consistently been observed as maintaining his sense of humor and perspective.

Tr. 20.

The ALJ found Ms. Bush's observations "generally credible." *Id.* However, the ALJ

Findings and Recommendation Page 15

found not credible Mr. Bush's testimony that he was sometimes incapacitated by nausea and

vomiting because

> the medical evidence of record does not reflect any basis for the claimant to be
> incapacitated for days for any reason, at any time, since the alleged disability onset
> date. The medical evidence of record reflects negative test findings and no
> established medical etiology for his alleged nausea and vomiting. He is
> independent in his activities of daily living with significant physical activity such
> as walking daily, doing Tai Chi and doing art painting, plus maintaining the
> household and preparing meals. . .

*Id.*

The ALJ concluded at step four that Mr. Bush was capable of returning to his past

relevant work as a library clerk. Tr. 21.

## STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards

and the findings are supported by substantial evidence in the record as a whole. Meanel v. Apfel,

172 F.3d 1111, 1113 (9th Cir. 1999). The initial burden of proving disability rests on the

claimant. Meanel, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment" which "has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 423(d)(3).

## DISCUSSION

1.    Rejection of physicians' opinions

Findings and Recommendation Page 16

Mr. Bush asserts that the ALJ erred at step two of the sequential evaluation by failing to provide adequate reasons for rejecting Dr. Bryan's opinion that he suffers from Somatoform Disorder and has a marked limitation in the ability to respond appropriately to work situations and settings.  Mr. Bush also challenges the ALJ's rejection of treating physician Dr. Dunham's opinion that Mr. Bush was disabled by nausea and vomiting.

In disability benefits cases, physicians typically provide two types of opinions: medical opinions that speak to the nature and extent of a claimant's limitations, and opinions concerning the ultimate issue of disability, i.e., opinions about whether a claimant is capable of any work, given her or his limitations.  *Holohan v. Massinari*, 246 F.3d 1195, 1202 (9th Cir. 2001).  Under the regulations, if a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Id.*; 20 C.F.R. § 404.1527(d)(2); Social Security Ruling (SSR) 96-2p. An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Holohan,* 246 F.3d at 1202.  Similarly, an ALJ may reject a treating physician's uncontradicted opinion on the ultimate issue of disability only with "clear and convincing" reasons supported by substantial evidence in the record. *Id.*

The severity determination at step two of the sequential evaluation requires a determination that 1) the impairment results from a condition that can be shown by medically acceptable clinical evidence; and 2) the severity must be such that it significantly decreases the physical or mental ability of a person to perform basic work activities.  20 C.F.R. §§ 404.1508, 4404.1520.  The two step analysis is a "de minimis screening device to dispose of groundless

claims," and requires the ALJ to consider the combined effect of all of the claimant's

impairments, regardless of whether each impairment alone was sufficiently severe.  *Edlund v.*

*Massanari*, 253 F.3d 1152, 1158 (9th Cir. 2001).

Examining psychologist Dr. Bryan's diagnosis of somatoform disorder, and his opinion

that Mr. Bush had marked limitations in the ability to respond appropriately to work situations

and changes in a routine setting, were uncontradicted.  Dr. Bryan's provisional diagnosis of

Cyclothymic Disorder is corroborated by Dr. Perry's observation in 2004 that she was

considering a variation of a bipolar or mood disorder because of indications of hypomanic

symptoms.  The ALJ was therefore required to provide clear and convincing reasons for rejecting

Dr. Bryan's opinions.

The ALJ rejected Dr. Bryan's diagnoses of Somatoform Disorder and Cyclothonic

Disorder on the grounds that 1) Dr. Bryan observed Mr. Bush's mood to be upbeat, cheerful and

lively with no indication of distress; 2) Mr. Bush was able to live with his wife, drive, tend to his

personal grooming and hygiene, and do basic housekeeping and light meal preparation; and 3)

Dr. Bryan did not assess a GAF score, but if he had, the ALJ thought it "would likely have been

within normal limits."  These are not convincing reasons.

A physician's statements must be read in context of the overall diagnostic picture he

draws.  *Holohan*, 246 F.3d at 1205.  The salient feature of Dr. Bryan's observations of Mr.

Bush's cheerful mood and upbeat demeanor is that Dr. Bryan thought they indicated a possible

hypomanic episode, because Mr. Bush also manifested rapid speech, over-elaboration of

symptoms, talkativeness, disorganized and uncompleted thought processes, and digressions.  Dr.

///

Findings and Recommendation Page 18

Bryan also recorded his observations of the retching episode, which he thought indicative of somatoform disorder.

The ability of Mr. Bush to drive himself, be independent in grooming and hygiene, and perform basic housekeeping and light meal preparation is not a convincing reason for rejecting Dr. Bryan's diagnoses of Somatoform Disorder and possible Cyclothonic Disorder because the ability to engage in such activities does not preclude those conditions; nor are these abilities inconsistent with Dr. Bryan's finding of marked limitation in Mr. Bush's ability to respond and adjust to normal work settings.

Another reason for the ALJ's rejection of the marked limitation finding was because "Dr. Bryan may have combined the claimant's complaint that stress adds to his nausea and vomiting," which was "not consistent with the claimant alleging continuing nausea and vomiting despite not having worked since early 2005." I find no indication in Dr. Bryan's evaluation that the marked limitation finding was based on Mr. Bush's reports of nausea and vomiting, rather than the mental impairments Dr. Bryan diagnosed, based on psychological testing and clinical observation.

The ALJ's finding that Dr. Perry's observations of clear and direct thought processes, lack of suicidal ideation, and ability to maintain a sense of humor and perspective were inconsistent with the observations of Dr. Bryan is similarly unconvincing, since Dr. Perry also noted that she thought Mr. Bush exhibited hypomanic symptoms.

The ALJ's conclusion that had Dr. Bryan done a GAF assessment it would likely have been within normal limits is mere  speculation, without any evidentiary basis in the record.

///

Findings and Recommendation Page 19

Dr. Bryan's uncontradicted diagnoses of agitated depression, somatoform disorder, and mild bipolar disorder, along with his opinion that Mr. Bush had marked limitations in a specific area of basic work activity, establish that Mr. Bush's depression and somatoform disorder are well over the *de minimis* threshold.  The ALJ erred at step two.

Moreover, the ALJ failed to provide clear and convincing reasons for rejecting Dr. Bryan's opinions.  The ALJ gave no reasons at all for rejecting the opinions of treating physician Dr. Dunham and examining physician Dr. Trubowitz that Mr. Bush was disabled by the episodes of nausea and vomiting.  As a treating physician, Dr. Dunham's uncontradicted opinion is entitled to controlling weight.  The ALJ's failure to consider this evidence was error.  See, e.g., *Flores v. Shalala*, 49 F.3d 562, 571 (9th Cir. 1995)  (ALJ may not reject significant probative evidence without explanation).

I conclude that the ALJ failed to provide sufficient reasons for rejecting the medical opinions and disability opinions of treating physician Dr. Dunham and examining physician Dr. Trubowitz, and the opinion of examining psychologist Dr. Bryan.  In such a situation, the medical opinions are credited as true.  *Hammock v. Bowen*, 867 F.2d 1209, 1213 (9th Cir. 1989); *Harman v. Apfel*, 211 F.3d 1172, 1178-79 (9th Cir. 2000).

### 2.    Credibility determination

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no affirmative evidence of malingering. *Smolen v. Chater,* 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ must identify what testimony is not credible and what evidence undermines the claimant's

complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick* at 724.

General findings, such as those citing to the "record in general" are an insufficient basis to

support an adverse credibility determination.  *Id.* at 722.

A claimant's testimony about pain may be disregarded if it is unsupported by medical

evidence which supports the *existence* of such pain, although the claimant need not submit

medical evidence which supports the *degree* of pain. *Bunnell v. Sullivan,* 947 F.2d 341, 347 (9th

Cir. 1991)(*en banc*). See also *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001) (fact that

claimant's testimony not fully corroborated by objective medical findings, in and of itself, is not

clear and convincing reason for rejecting it).

The ALJ rejected Mr. Bush's testimony that he believed his chronic nausea and vomiting

could be related to his Hodgkin's lymphoma, on the ground that "the record and his testimony

were not persuasive in establishing any link between the two impairments.  The medical evidence

of record consistently reflects no established etiology for his alleged nausea and vomiting."  Tr.

19.  This finding is erroneous.  While there is no medical consensus on the cause of Mr. Bush's

symptoms, and no specific diagnostic test in the record to explain them, the evidence does reflect

conditions that could cause nausea and vomiting.  Doctors Trubowitz and Dunham thought the

nausea and vomiting were secondary to the stem cell transplant.  Dr. Salomon thought they might

be the result of prior chemotherapy, secondary to diabetes, medication, or irritation of the central

nervous system from medication or tumor, or stress-induced.

Moreover, when the record contains no medical signs or laboratory findings of a physical

impairment capable of producing the alleged symptoms, the ALJ must consider the existence of a

mental impairment. *Matney on Behalf of Matney v. Sullivan,* 981 F.2d 1016 (9th Cir. 1992).  Dr.

Bryan attributed them to Somatoform Disorder, whose diagnostic criteria specifically require that the symptoms cannot be fully explained by a known general medical condition or the direct effects of a substance, or that the physical complaints are in excess of what would be expected from the history, physical examinaton or laboratory findings.  See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition Text Revision ("*DSM-IV-TR")* 490.  As noted above, the ALJ rejected the diagnosis of Somatoform Disorder.

The ALJ also found Mr. Bush not credible on the basis of his ability to care for himself, walk several miles a day, do housekeeping chores and prepare meals, drive, and paint art works. In evaluating credibility of symptom testimony, the ALJ may discredit the claimant's allegations if a claimant is "able to spend a substantial part of [his] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.*"  Morgan v. Comm'r,* 169 F.3d 595, 600 (9th Cir. 1999).  However, the mere fact that a claimant has carried on certain daily activities, such as taking care of himself, grocery shopping, driving a car, and walking for exercise does not detract from credibility as to overall disability. *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001).  If the ALJ makes an adverse credibility finding based on the performance of physical functions transferable to a work setting, the ALJ must make "specific findings relating to the daily activities" and their transferability.  *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007).  The ALJ failed to satisfy this requirement.

And finally, the ALJ noted that Mr. Bush had testified that he applied for DIB because his private disability insurance company, from which he receives $1600 a month, required him to do so.  The ALJ observed, "This sum is similar to that received when employed and may be a

disincentive to a return to work he clearly did not enjoy." Tr. 20.  A claimant's motive of

pecuniary gain is an improper basis on which to determine that subjective complaints are not

credible.  *Ratto v. Sec'y*, 839 F. Supp. 1415 (D. Or. 1993).  I conclude that the ALJ has failed to

provide sufficient reasons for rejecting Mr. Bush's testimony.

In *Varney v. Secretary of Health and Human Services (Varney II),* 859 F.2d 1396, 1398-

99 (9th Cir. 1988), the court held that a claimant's pain testimony must be accepted as true when it

is inadequately rejected by the ALJ.

        3.     <u>Remand</u>

Sentence four of 42 U.S.C. § 405(g) gives the court discretion to decide whether to

remand for further proceedings or for an award of benefits. *Harman,* 211 F.3d at 1179.

In *Smolen*, 80 F.3d at 1292, the court held that improperly rejected evidence should be

credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide

legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must

be resolved before a determination of disability can be made, and 3) it is clear from the record

that the ALJ would be required to find the claimant disabled were such evidence credited.

The three conditions are met here.  Accordingly, I recommend that this case be reversed

and remanded for the payment of benefits.

///

///

///

Findings and Recommendation Page 23

**SCHEDULING ORDER**

These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due July 25, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due14 days thereafter.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 7th day of July, 2011.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge